DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from a judgment of the Lucas County Court of Common Pleas, Juvenile Division, that terminated the parental rights of appellant, Jamila J., the natural mother of Deasean J., and granted permanent custody to appellee, Lucas County Children Services ("LCCS").
 {¶ 2} Deasean J. was born in October 2005. Before Desean was released from the hospital, health care professionals contacted LCCS because they were concerned that Jamila was not bonding with Deasean and was having trouble properly feeding him. Amy Tyson, then an investigative caseworker with LCCS, met Jamila in the hospital two days after Deasean's birth, to address the hospital's concerns. Jamila then agreed to a safety plan under which she would return to her parents' home and all of her contact with Deasean would be supervised by her mother, Theresa J. In addition, LCCS shift workers would be sent to the home on a regular basis to ensure that Deasean was being properly fed and cared for.
 {¶ 3} This was not Jamila's first contact with LCCS. In 2001, her parental rights to another son, Teijuan, born in November 1999, were terminated. The conditions leading to that termination included medical neglect and deplorable housing conditions. Indeed, in that case, Jamila told a LCCS caseworker that she did not believe the conditions in her home were good for Teijuan and she did not feel that she could adequately care for him. The court in that case found that Jamila and Teijuan's father demonstrated a lack of commitment to Teijuan, that Jamila failed to follow through with a substance abuse assessment and mental health services, and that Jamila was inconsistent in her visitation with Teijuan and not attentive to him during visitation.
 {¶ 4} Approximately two weeks after Deasean's birth, Jamila took him to the doctor and reported that he had chronic diarrhea. Deasean weighed 7 pounds 4 ounces at birth. One week after his birth he weighed 7 pounds 3 ounces. One week later, he weighed 6 pounds 12 ounces, and on the day Jamila took him to the doctor, he weighed 6 pounds 9 ounces. The doctor then referred Deasean to the hospital for admission to evaluate his failure to gain weight. While in the hospital, Deasean "fed vigorously," and gained weight over the course of three days. He had no episodes of vomiting or diarrhea and his stool samples failed to demonstrate any medical problem. He was then diagnosed with non-organic failure to thrive. Upon Deasean's discharge, home health care was arranged to visit Jamila's home three times a week and to weigh Deasean three times for a period of one week. In addition, Jamila was given a daily feeding log to help her keep track of when Deasean ate and how much he was eating. Subsequently, a visiting nurse called Tyson to report that Deasean seemed to be losing weight again. Tyson then scheduled a staff meeting at LCCS, to discuss with Jamila the agency's concerns regarding Deasean and to ensure that Jamila understood the need to properly and regularly feed her child. LCCS also determined that Jamila needed to attend parenting classes and look into MRDD services. Tyson told Jamila that a case would be opened, but at the conclusion of the staff meeting, LCCS decided not to remove Deasean from the home at that time.
 {¶ 5} Subsequently, on November 17, 2005, Tyson received a call from a visiting nurse who was extremely concerned about Deasean's condition. He was not gaining weight and his skin was showing signs of dehydration. At that point, Deasean was approximately one month old and still weighed one ounce less than he did at birth. LCCS then decided to seek permanent custody of Deasean and that day obtained an order from the lower court to take Deasean into custody at once.
 {¶ 6} On November 18, 2005, LCCS filed an original complaint for permanent custody and a motion for a shelter care hearing in the court below. The complaint alleged that in light of the facts as set forth above, Deasean was dependent and neglected and that because Jamila had already had her parental rights to another child terminated, LCCS was not required to make reasonable efforts to prevent Deasean's removal.
 {¶ 7} The case proceeded to both the adjudication and disposition hearings on January 24, 2006. At the adjudication hearing, Jamila stipulated to the accuracy of the allegations set forth in the complaint and to a finding that Deasean was dependent and neglected. After finding Deasean dependent and neglected, the court took a short recess and then proceeded to the dispositional hearing. At that hearing, Keely Gray, the LCCS ongoing caseworker assigned to the case, and Amy Tyson testified for LCCS, and Theresa J., Jamila's mother, Clayvaughn S., Jamila's friend, and Jamila testified for Jamila. In addition to the facts as set forth above, the following evidence was presented to the court.
 {¶ 8} Tyson testified that Theresa J. and her husband, with whom Jamila lives, have severe health problems that make helping to care for Deasean difficult. In addition, although Jamila's four siblings and step siblings also live in the home, LCCS has received at least six referrals since 1997, regarding the conditions in the home, and one step-sister has been involved in court proceedings for her unruliness. Moreover, one of Jamila's brothers has down syndrome and Theresa and her husband are his primary caretakers.
 {¶ 9} After Deasean was removed from Jamila's custody, he was placed with the couple who adopted his brother Teijuan. Within four days of his removal, he gained nearly one pound of weight. Since then, Deasean has suffered from seizures, for which he takes medication, and low muscle tone for which he receives occupational therapy. Keely Gray testified that although neither Jamila nor Deasean were tested upon Deasean's birth, the seizures raised a question as to whether Deasean was exposed to drugs prenatally. Indeed, Jamila admitted to using marijuana once while Deasean was in the hospital for feeding issues. After Deasean was removed from her custody, Jamila was granted weekly visitation with him. Between the first visit on December 21, 2005, and the date of the hearing, January 24, 2006, Jamila missed two visits. During the two visits that she did attend, Gray testified that Jamila was delayed in her cognition and did not seem to interact with Deasean. Although she held Deasean, she did not seem to cuddle him or talk to him. She also admitted to Gray that she did not understand how to feed him. This was after proper feeding had been explained and re-explained to her. Jamila did follow through with appointments and had an assessment with MRDD, but it was determined that she was not eligible for services. She also attended three parenting classes.
 {¶ 10} Theresa J. testified that shortly after Jamila brought Deasean home from the hospital after his birth, she and Jamila noticed that the formula was "running right through him." She and Jamila then took Deasean back to the doctor, who changed his formula. Theresa stated that while he was in her home, Deasean was fed by Jamila and others in the home every four hours in keeping with the schedule that Jamila was instructed to follow. When questioned about her ability to help care for Deasean, Theresa denied ever telling the LCCS caseworker that she was unable to care for him and testified that she could help care for him. She further stated that Jamila loves Deasean and has bonded with him. In describing Jamila, Theresa stated that she took special education classes in high school but did not finish school. She further testified that Jamila has lived at home ever since and, although she has had a couple of jobs, is unemployed. With regard to Jamila's missed visits, Theresa stated that her, Theresa's, car broke down and so Jamila was unable to attend. She agreed, however, that Jamila did not call the agency to report that she would not be able to attend the visits. Theresa also testified about her family's history with LCCS and admitted that the agency has received approximately 12 referrals since 1990. One referral regarded her son Brandon for failure to thrive, and alleged that she was not feeding him properly. Theresa denied that she improperly fed Brandon.
 {¶ 11} In addition to Theresa, Clayvaughn S. testified on Jamila's behalf. Clayvaughn is a 15 year old friend of Jamila who has known her for about six years. Clayvaughn stated that he has observed Jamila with Deasean and stated that she feeds him on a regular basis and is a very caring mother. He also testified that Jamila has taken parenting classes.
 {¶ 12} Finally, Jamila testified on her own behalf. Jamila stated that after Deasean's birth she took him to all of his well-baby appointments. It was at one of these appointments that she first mentioned to the doctor the problem with Deasean's diarrhea. Deasean was then admitted to the hospital, where he gained weight. Jamila stated that after Deasean was released from the hospital and she was receiving visits from a visiting nurse, she did everything the nurse told her to do regarding feeding Deasean, including keeping a log of his feedings, but that Deasean continued to have diarrhea. She further admitted, however, that she only kept the feeding logs until about November 10, 2005. With regard to Teijuan, Jamila admitted that she did not follow through on the parenting classes that she was required to attend.
 {¶ 13} In addition to the testimony set forth above, the lower court considered the report and recommendation of the guardian ad litem. The guardian ad litem reported that as of the time that she prepared her report, December 28, 2005, Deasean weighed 9 pounds 14 ounces, and therefore was steadily gaining weight. He was, however, having seizures and tremors and his foster mother reported that his doctor is certain that Deasean was exposed to narcotics and is suffering withdrawal. Jamila, however, denied ever using drugs during her pregnancy. The guardian ad litem further reported that Jamila's family home is also home to mice and cockroaches and is uninhabitable for an infant. In describing Deasean's needs, the guardian ad litem stated that in addition to needing a permanent, safe, loving, enriching environment, he may need ongoing medical care for his apparent drug addiction, and that it could take years before the extent of the damage is discovered. Accordingly, he may need additional services as he gets older. The guardian ad litem concluded that although Jamila seems to be a sweet person, she may be mentally delayed and easily manipulated. The guardian ad litem then concluded that it would be in Deasean's best interest to remain with his foster family and therefore recommended that permanent custody be awarded to LCCS.
 {¶ 14} On February 14, 2006, the lower court issued a judgment entry terminating the parental rights of Jamila and the alleged father of Deasean, "John Doe" or "Perry Doe."[1]
Pursuant to R.C. 2151.353(A)(4) and 2151.414(E)(4) and (11), the court found by clear and convincing evidence that Deasean should not be placed with either parent within a reasonable time and that, pursuant to R.C. 2151.414(D), an award of permanent custody was in Deasean's best interest. Specifically, the court found under R.C. 2151.414(E)(4), that Jamila had demonstrated a lack of commitment to Deasean, in that she had been provided with visitation opportunities since his removal from her care and had failed to visit him consistently. The court further found under R.C. 2151.414(E)(11), that Jamila had had her parental rights terminated with respect to a sibling of Deasean and that the conditions that existed at the time of that removal were similar to the conditions that caused Deasean's removal, specifically, poor medical care and marginal home conditions. The court then noted that in the sibling case plan, Jamila was offered services to remedy the conditions that caused the removal but failed to follow through with those services and her parental rights were terminated. The court further determined that although, under R.C. 2151.419(A)(2)(e), LCCS was not required to make reasonable efforts to prevent Deasean's removal from the home, LCCS did make those efforts by providing a safety plan, visiting nurse services and community referrals. Those services, however, were insufficient to prevent Deasean's removal from the home. Finally, the court found that it was in the best interest of Deasean to award LCCS permanent custody of him for adoptive placement. Accordingly, the court awarded LCCS permanent custody of Deasean and terminated Jamila's parental rights. It is from that judgment that Jamila appeals.
 {¶ 15} Jamila's appeal challenges the trial court's judgment through the following assignments of error:
 {¶ 16} "Assignment of Error No. 1. Trial Court's legal finding that Mother demonstrated a lack of commitment to the child was against the manifest weight of the evidence.
 {¶ 17} "Assignment of Error No. 2. Trial Court's legal finding that Mother failed to remedy inappropriate housing and medical conditions which existed at the time of the removal of the sibling from the home was against the manifest weight of the evidence.
 {¶ 18} "Assignment of Error No. 3. While the Trial Court correctly held that Mother had her parental rights terminated with respect to her first child, such finding alone should not be sufficient to remove Mother's parental rights with respect to her second child where Mother was improving her parenting abilities."
 {¶ 19} Because Jamila's assignments of error are interrelated, they will be addressed together. Jamila asserts that the trial court's findings in support of the permanent custody award were against the manifest weight of the evidence and that the fact that she had her parental rights terminated with respect to Teijuan should not alone be sufficient cause to terminate her parental rights to Deasean.
 {¶ 20} The disposition of a child determined to be dependent, abused or neglected is controlled by R.C. 2151.353 and the court may enter any order of disposition provided for in R.C.2151.353(A). Before the court can grant permanent custody of a child to a public children services agency, however, the court must determine: 1) pursuant to R.C. 2151.414(E) that the child cannot or should not be placed with one of his parents within a reasonable time; and 2) pursuant to R.C. 2151.414(D), that the permanent commitment is in the best interest of the child. R.C.2151.353(A)(4). R.C. 2151.414(E) provides that, in determining whether or not a child can or should be placed with a parent within a reasonable time, the court shall consider all relevant evidence. If, however, the court determines by clear and convincing evidence that any one of the sixteen factors listed in the statute exist, the court must find that the child cannot be placed with the parent within a reasonable time or should not be placed with the parent. Those factors include:
 {¶ 21} "(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
 {¶ 22} "* * *
 {¶ 23} "(11) The parent has had parental rights involuntarily terminated pursuant to this section or section 2151.353 or2151.415 of the Revised Code with respect to a sibling of the child." R.C. 2151.414(E).
 {¶ 24} Clear and convincing evidence is that proof which establishes in the mind of the trier of fact a firm conviction as to the allegations sought to be proved. Cross v. Ledford
(1954), 161 Ohio St. 469. In determining the best interest of the child, R.C. 2151.414(D) directs that the court shall consider all relevant factors, including, but not limited to:
 {¶ 25} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 {¶ 26} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."
 {¶ 27} Upon a thorough review of the record in this case, we conclude that the trial court's findings that Deasean should not be placed with Jamila within a reasonable time and that permanent custody was in Deasean's best interest were supported by clear and convincing evidence. That Jamila's parental rights to Deasean's brother had been terminated four years earlier was sufficient under the statute to support the court's decision. R.C. 2151.414(E)(11); R.C. 2151.414(D)(5). See In the matter ofDemetrius H. (Mar. 9, 2001), 6th Dist. No. L-00-1300. Nevertheless, the court further examined Jamila's circumstances as they existed at the time of the proceedings below. Despite extensive instruction, Jamila was unable to provide Deasean with the most basic of human needs, food. She simply could not understand how to feed him the proper amount of food at proper intervals. Each time he was removed from her care, he fed well and gained weight. There was no medical reason for his failure to thrive. Despite the provision of feeding instruction and visiting nurses, while Deasean was under Jamila's care he lost weight. Indeed, when he was finally removed from her care at the young age of one month, he was dehydrated and still under his birth weight. After Deasean's removal, Jamila only attended one-half of the visits provided and appeared inattentive to Deasean during those visits. Regarding the conditions of the family home, although Amy Tyson testified that when Deasean was born the home was feasible for living, she admitted that there were ongoing concerns. Moreover, the guardian ad litem reported seeing mice and cockroaches in the home which, in her opinion, an infant would be unable to defend himself against. Indeed, the conditions in the home had been the subject of numerous referrals to LCCS. Accordingly, although the lower court was not required to find that Jamila failed to remedy inappropriate housing conditions which existed at the time of Teijuan's removal to support its termination order, the court's finding in this regard was supported by clear and convincing evidence.
 {¶ 28} As there was clear and convincing evidence to support the trial court's findings that Deasean should not be placed with Jamila within a reasonable time and that an award of permanent custody was in Deasean's best interest, the trial court did not err in terminating Jamila's parental rights. The three assignments of error are not well-taken.
 {¶ 29} On consideration whereof, the court finds that substantial justice has been done the party complaining and the judgment of the Lucas County Court of Common Pleas, Juvenile Division is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
Judgment Affirmed.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
Handwork, J. Pietrykowski, J. Parish, J. concur.
[1] Jamila reported that she did not know Deasean's father, that his name was "Perry" and that he was from New York. Although duly served and summoned, the purported father of Deasean failed to make an appearance in the proceedings below and never established paternity.